IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

DEBORAH LOVING,          )
                            )
           Plaintiff,     )
                            )
                            )
          v.         )      CIVIL NO. 3:11-cv-411-HEH
                            )
MICHAEL J. ASTRUE,     )
    Commissioner of Social Security,  )
                            )
         Defendant.     )
_____)

## REPORT AND RECOMMENDATION

Deborah Loving ("Plaintiff") suffers from rheumatoid arthritis, fibromyalgia[1] and fatigue. She worked since 1974 in different careers, including as a sales associate, office manager and delinquency prevention officer. In her last job, she worked for nearly a decade as an office manager and groundskeeper for King George Mini Storage, where her supervisor wrote that "[s]he was truly an asset to [the] business when she was able to work." (R.[2] at 228). But Plaintiff's health declined and she was no longer able to work, despite her employer supplying "extensive measures" to assist her. (R. at 228.) She resigned on December 31, 2007, because, as her employer stated, she "could no longer work." (R. at 228.)

Thereafter, on January 10, 2008, Plaintiff applied for Social Security Disability ("DIB") under the Social Security Act (the "Act") with an alleged onset date of December 28, 2007.

---

[1] Fibromyalgia consists of "pain and stiffness in the muscles and joints that either is diffuse or has multiple trigger points." *Dorland's Illustrated Medical Dictionary* 703 (31st ed. 2007).

[2] "R." refers to the record and "O.A." refers to the Oral Argument.

Administrative Law Judge Drew A. Swank ("the ALJ") conducted a hearing on Plaintiff's claim on April 17, 2009, and then issued an opinion denying Plaintiff's request for DIB benefits on January 28, 2010 — nearly nine months after the hearing — an unusually long delay for the issuance of an opinion for which counsel for the Commissioner could not explain. (O.A. at 4:20 P.M.)

Approximately fifteen months later, on April 25, 2011, the Appeals Council denied Plaintiff's request for review. Thus, more than three years after Plaintiff left her job "because she could no longer work" and after Plaintiff filed her claim for DIB benefits, the Commissioner reached a final decision denying her benefits.

Despite taking nearly nine months to issue a decision, the actual substance of the ALJ's analysis of the case (beyond recounting the law and Plaintiff's medical history) essentially consists of one paragraph — which is rife with error. One error is particularly significant: "[Plaintiff] was not referred to a specialist for treatment of fibromyalgia but continued to see her primary care physician at Virginia Physicians." (R. at 16). The record demonstrates that Plaintiff's primary care physician was a specialist (a rheumatologist). This clear error has particular import in this area of the law due to the well-established "treating physician" rule. *See Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (a treating physician's opinion must be given controlling weight if it is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record); 20 C.F.R. § 416.927(d)(2); SSR 96-2p. *See also Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 245 (6th Cir. 2007) (recognizing the particular significance of the treating rheumatologist, "given the unique nature of fibromyalgia").

2

After reviewing the record and pleadings in this case, the Court *sua sponte* ordered oral argument that occurred on June 8, 2012; included on that oral argument docket was another case handled by ALJ Swank: *Valley v. Astrue*, No. 3:11-cv-260-HEH. The Court ordered oral argument after seeing a pattern of problems with ALJ Swank's decisions. During this calendar year alone, five cases handled by ALJ Swank have been remanded either as a result of the agreement of the parties or based on this Court's Report and Recommendation.[3]  And these five cases only encompass appeals of ALJ Swank's decisions filed in the Richmond Division of this Court. Like this case, other decisions by ALJ Swank have included clear factual errors relevant to the disposition of a claim.[4]

Today, we add two more cases to the list of reversals of ALJ Swank's opinions. Along with this Report and Recommendation, the Court also recommends that *Valley v. Astrue*, No. 3:11-cv-260-HEH, be remanded. At oral argument, counsel for the Commissioner indicated that ALJ Swank has since transferred to Charlottesville and is now under the purview of the Western District of Virginia; however, a number of appeals of his opinions in other cases remain pending in this district. Consequently, at oral argument, the Court directed counsel for the Commissioner to engage in a full review of all ALJ Swank cases pending before the Court by July 9, 2012.

In this case, Plaintiff challenges ALJ Swank's denial of DIB benefits, specifically his determination that Plaintiff had the residual functional capacity ("RFC") to perform light work with some limitations. (R. at 15.) Plaintiff alleges that the ALJ erred, as his findings with

---

[3] The five cases are: *Williams v. Astrue*, No. 3:11-cv-208-JAG; *Turner v. Astrue*, No. 3:11-cv-275-JAG; *Proffit v. Astrue*, No. 3:11-cv-310-JRS; *Lyons v. Astrue*, No. 3:11-cv-495-HEH; and *McGuigan v. Astrue*, No. 3:12-cv-145-JAG.

[4] For example, in *Turner v. Astrue*, No. 3:11-cv-275-JAG, this Court recommended a remand of the case, because ALJ Swank failed to analyze the opinion of Plaintiff's treating physician.

respect to Plaintiff's RFC and past relevant work were contrary to legal standards and not

supported by substantial evidence. (Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") at

7-24.)

Plaintiff seeks judicial review of the ALJ's decision in this Court pursuant to 42 U.S.C. §

405(g). The parties have submitted cross-motions for summary judgment and supplemental

briefs, which are now ripe for review.[5] Having reviewed the parties' submissions and the entire

record in this case, the Court is now prepared to issue a report and recommendation pursuant to

28 U.S.C. § 636(b)(1)(B). For the reasons that follow, it is the Court's recommendation that

Plaintiff's motion for summary judgment and motion to remand (ECF No. 7) be GRANTED;

that Defendant's motion for summary judgment (ECF No. 9) be DENIED; and that the final

decision of the Commissioner be REVERSED and FULL BENEFITS BE AWARDED, effective

as of December 28, 2007.

## I. MEDICAL HISTORY

Plaintiff contests the ALJ's decision pertaining to her RFC and, as a result, her

musculoskeletal impairments. (*See* Pl.'s Mem. at 2-4.) Therefore, the Court will focus on

Plaintiff's musculoskeletal maladies and activities of daily living.

**A.      Plaintiff's Medical Records**

Plaintiff was 51-years-old at the time of her alleged onset, December 28, 2007. (*See* R. at

94.) She visited Steven J. Maestrello, M.D., a rheumatologist, on January 22, 2007. (*See* R. at

---

[5] The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

267, 307.) Dr. Maestrello documented that Plaintiff was using Duragesic patches with modest improvement and taking Cymbalta with uncertain improvement. (R. at 267.) He assessed normal sensation and strength in Plaintiff's extremities and Plaintiff's tenderness and pain. (R. at 267.) Dr. Maestrello also noted fibromyalgia, chronic narcotic use[6] and evidence of degenerative disc disease on an MRI of Plaintiff's cervical spine. He increased Plaintiff's Cymbalta usage, but decreased her Hydrocodone usage. (R. at 267.)

On March 8, 2007, Plaintiff complained to Dr. Maestrello that she had been having intermittent twitching of the upper and lower extremities and had almost spontaneously bit off her tongue. (R. at 265.) He indicated that Plaintiff's twitching could be a result of restless leg syndrome. (R. at 265.) Dr. Maestrello noted that the higher Cymbalta dosage had helped with Plaintiff's pain, but that she still complained of pain and had tenderness all over her body. (R. at 265.)

Two months later, Plaintiff visited Dr. Maestrello for joint pain. (R. at 261.) Plaintiff had noticed more pain since her last visit, was still feeling pain in her extremities and found that Zanaflex was causing drowsiness. (R. at 261.) Plaintiff's bone density scan indicated evidence of osteopenia in the spine. (R. at 261.) While Plaintiff had tenderness in her feet, Dr. Maestrello noted no inflammation in Plaintiff's hands and wrists and a full range of motion in Plaintiff's hips, knees, ankles and shoulders. (R. at 261.)

On July 25, 2007, Plaintiff complained to Dr. Maestrello of muscle and joint pain and stiffness with intermittent episodes of lightheadedness and muscle twitching. (R. at 259.) Plaintiff alleged that her pain was becoming worse in her arms, back and legs. (R. at 259.) Dr.

---

[6] In this situation, "chronic narcotic use" describes the fact that Plaintiff was dependent on pain medicine, prescribed by Dr. Maestrello, to handle her severe pain.

Maestrello observed Plaintiff's persistent fatigue, muscle twitching and chronic diffuse pruritus.[7] (R. at 259.) He further documented tenderness over her lateral epicondyles, upper trapezia, paralumbar region and trochanteric region. (R. at 259.) Finally, Dr. Maestrello noted Plaintiff's fibromyalgia and wrote that it was "clearly present today and certainly could account for the pain and fatigue" and that her persisting problem was "considered to be moderate to high in severity." (R. at 259-60.)

Three months later, Plaintiff complained of increasingly worse, diffuse pain in her arms, back, legs and hips, and that she was having problems with restless leg syndrome. (R. at 257.) Dr. Maestrello noted that Plaintiff had normal sensation and strength in her extremities, lack of synovitis,[8] and tenderness over the lateral epicondyles, upper trapezia region, paralumbar region and trochanteric region. (R. at 257.) Dr. Maestrello increased Plaintiff's medication. (R. at 257.)

On January 23, 2008, Plaintiff complained of diffuse pain and stiffness in multiple joints. (R. at 256.) Plaintiff told Dr. Maestrello that she was applying for social security disability and Dr. Maestrello included in his notes that "Plaintiff [was] unable to work due to both a combination of pain and fatigue." (R. at 256.) He noted that the Duragesic patch would wear off in two days and that Plaintiff was using Hydrocodone to supplement the patch and to ease her pain. (*See* R. at 256.) Plaintiff was also taking Lyrica, but was afraid to use morphine cream on her knees for fear of addiction. (R. at 256.) Dr. Maestrello noted a normal sensation, crepitance,[9] strength in her extremities, and tenderness in her knees, as well as tenderness in her

---

[7] Pruritis is also known as itching. *Dorland's* at 1540.

[8] Synovitis is a type of inflammation that is "usually painful, particularly on motion, and is characterized by a fluctuating swelling." *Dorland's* at 1856.

[9] Crepitant is a "rattling or crackling." *Dorland's* at 429.

lateral epicondyles, upper trapezia region, paralumbar region, trochanteric region and anserine bursa regions. (R. at 256.) Dr. Maestrello also noted bilateral knee pain, some of which could have been a result of osteoarthritis. He then increased Plaintiff's Lyrica dosage. (R. at 256.)

Four months later, Plaintiff noticed persistent pain in her arms, back, legs, hips and shoulders. (R. at 352.) She had normal sensation and strength in her extremities, diffuse tenderness and tenderness over her lateral epicondyles, upper trapezia, paralumbar region and trochanteric region. (R. at 352.) Dr. Maestrello opined that Plaintiff's fibromyalgia accounted for "most of her problems." (R. at 352.)

On August 13, 2008, Plaintiff complained of persistent pain in her neck, back, feet, ankles and shoulders. (R. at 350.) Dr. Maestrello observed that the Cymbalta was not providing Plaintiff much relief. (R. at 350.) He also noted normal sensation and strength in Plaintiff's extremities, but tenderness in her knees, neck, upper trapezius and paralumbar region, and pain in the trochanteric and anserine bursa region. (R. at 350.)

Plaintiff complained of severe and diffuse pain in the neck and shoulders on November 12, 2008. (R. at 382.) Dr. Maestrello noted that Plaintiff requested that he increase her narcotics dosage again, but Dr. Maestrello was "very hesitant to do [it], particularly given the fact that when [Plaintiff] has come in she is on higher dose narcotics and still doing poorly." (R. at 382.) Dr. Maestrello recommended physical therapy, but Plaintiff indicated she might not be able to financially afford it. (R. at 382.) Dr. Maestrello observed that Plaintiff had difficulty walking and used a cane. (R. at 382.) He further noted that Plaintiff appeared "miserable" and walked with "an antalgic gait using a cane." (R. at 382.) Plaintiff had no synovitis, but was tender over the lateral epicondyles, upper trapezia, paralumbar region and trochanteric region. (R. at 382.)

On February 11, 2009, Plaintiff complained of having severe pain, achiness and stiffness in her joints, shoulders and hands. (R. at 381.) Dr. Maestrello again observed no synovitis, but noted tenderness over both anserine bursa and diffuse tenderness over the arms, lateral epicondyles, anterior chest wall, upper trapezia and trochanteric region. (R. at 381.) Dr. Maestrello assessed Plaintiff's diffuse tender points as being consistent with fibromyalgia. (R. at 381.)

## B.   The Opinions of the Non-treating State Agency Physicians

On February 22, 2008, Plaintiff's DIB claim was referred to Syed Hassan, M.D., a state agency physician who never examined the Plaintiff and whose qualifications are not set forth in the record. (*See* R. at 310-16.) Based on his review of Plaintiff's medical records, Dr. Hassan determined that Plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday and push or pull for an unlimited amount of time. (R. at 310-16.) Dr. Hassan also marked that Plaintiff could occasionally climb, balance, stoop, kneel, crouch and crawl and that Plaintiff had no manipulative, communicative, environmental or visual limitations. (R. at 313-14.)

Dr. Hassan supported his findings by explaining that Plaintiff had never been treated for pain and tenderness in multiple areas, had no synovitis and had a full range of motions and normal strength. (R. at 316.) Dr. Hassan also noted that Plaintiff had no difficulty sitting or standing, used a cane without needing one and had complained of dizziness, but was not diagnosed with a cause. (R. at 316.)

On October 21, 2008, Luc Vinh, M.D., a state agency physician, indicated the same limitations in Plaintiff's movements as Dr. Hassan. (*See* R. at 364-70, 310-16.) As with Dr.

Hassan, Dr. Vinh never examined the Plaintiff and the record is devoid of any discussion of his area of expertise; however, counsel for the Commissioner acknowledged during oral argument that Dr. Vinh is not a rheumatologist. (O.A. at 4:48 P.M.) Dr. Vinh noted that Plaintiff had fibromyalgia, coronary artery disease and degenerative joint disease, and that Plaintiff had been treated for pain and tenderness in multiple areas, but never had synovitis. (R. at 369.) He also summarized Plaintiff's medical history, noting that she had a full range of motion and normal strength, along with persistent pain, tenderness and degenerative joint disease in her knees. (R. at 369.)

## C.     Statements from Plaintiff's Friends and Family

In addition to the medical evidence from her treating physician and her own testimony, Plaintiff presented compelling evidence from her neighbors, family members and her last employer that corroborated Plaintiff's account of the debilitating nature of her illness. On January 4, 2009, Frank and Elizabeth Bowles, Plaintiff's neighbors, wrote a statement concerning Plaintiff's declining health. (R. at 214.) They described Plaintiff as constantly being in "agonizing pain with very limited mobility" and requiring the assistance of a cane or needing to lie down due to exhaustion. (R. at 214.) Mr. and Mrs. Bowels wrote that Plaintiff needed constant pain medication that made her incapacitated and required that she stay home on the couch or in bed. (R. at 214.) They explained that Plaintiff was unable to enjoy everyday activities, could not wash dishes and struggled to walk the steps in front of her home. (R. at 214.)

On March 31, 2009, Holly Hayden, Plaintiff's daughter-in-law, wrote a statement about Plaintiff's health, which had been "spiraling downward for quite some time." (R. at 226.) Ms. Hayden wrote that Plaintiff rarely attended family get-togethers and, if she did, she did not stay

long due to pain and fatigue, and that Plaintiff would frequently lie on the couch without interacting with her grandchildren. (R. at 226.) Ms. Hayden recounted that Plaintiff frequently napped when she worked at King George Mini Storage, because she was exhausted. (R. at 226.) She noted that Plaintiff's pain patch required Plaintiff to become bedridden. (R. at 226.) Ms. Hayden observed that Plaintiff spoke slowly and had difficulty putting her thoughts together. (R. at 226.) Finally, Ms. Hayden wrote that it had been hard to watch Plaintiff "go from being full of life to being exhausted and in pain all the time. . . . Each day is a challenge for her." (R. at 226.)

Joey F. Loving, Plaintiff's husband since 1986, also submitted a statement about Plaintiff's condition. (R. at 229.) Mr. Loving described Plaintiff as having been active with the local sheriff's office, credit union, work and fundraisers before her health started to decline. (R. at 229.) She was also very involved with her children and grandchildren. (R. at 229.) Mr. Loving missed work on "countless occasions," because he had to take care of his wife, who was "unable to care for herself due to the extreme pain and inability to move." (R. at 229.) On those occasions, Plaintiff could not leave bed to drink or eat. (R. at 229.) Mr. Loving needed to take Plaintiff to the doctor, pick up her prescriptions, keep the house clean, cook meals, take care of the yard work, do laundry and perform other household tasks, because Plaintiff was unable to do so. (R. at 229.)

Sandra H. Walker, who had known Plaintiff for at least twenty-five years, also wrote a statement about Plaintiff's activities. (R. at 227.) Ms. Walker noted that Plaintiff was a very active and lively person, who became ill and whose personality changed. (R. at 227.) Ms. Walker observed Plaintiff walking with a cane, suffering nauseating pain and becoming very sleepy with the need to lay down most of the time. (R. at 227.) Ms. Walker noted that when she visited or called, Plaintiff was in bed and very ill. (R. at 227.)

10

As noted above, Plaintiff tendered a statement dated March 31, 2009 from her last employer, Paul Kang, for whom Plaintiff worked from May 19, 1998 through December 31, 2007. (R. at 228.) Due to the compelling nature of the statement and because the record lacks any evidence that undermines Mr. Kang's statement, the Court sets forth the entirety of the statement:

> Mrs. Loving had been employed by me from May 19, 1998 thru December 31, 2007. During this time I have observed that her physical health was in decline. I went to extensive measures for Mrs. Loving by putting in a couch for her to rest. She was constantly in severe pain and had to lay down. She would fall off to sleep because of the medication for pain. She had to eventually walk with a cane. At one time Mrs. Loving was an active and vibrant person, her personality had changed. Her whole personality had changed. Her facial appearance would appear to be pale and her eyes taunt. It became so that her physical activivty [*sic*] decreased. She could not bend or stand for any period of time. On December 31, 2007, Mrs. Loving gave her resignation and could no longer work. She was truly an asset to this business when she was able to work. She was absent many times, but we worked together to help her.

(R. at 228.)

Barbara Payne also observed Plaintiff at work. She wrote a statement describing how Plaintiff's health had deteriorated rapidly over the course of the five years that she had known Plaintiff. (R. at 225.) Ms. Payne stated that Plaintiff "struggled to maintain her job" and had many absences at work due to her pain and weakness. (R. at 225.) Ms. Payne witnessed Plaintiff's difficultly with sitting and standing for more than a few minutes, and that Plaintiff would be "weak, dizzy, [and] seems to be extreme in pain." (R. at 225.) Ms. Payne also noted that Plaintiff could not drive and "sometimes had to miss medical [appointments] due to her illness being so severe." (R. at 225.) Finally, Ms. Payne described Plaintiff as often looking and sounding fatigued. (R. at 225.)

11

**D.**     **Plaintiff's Testimony**

Plaintiff completed an adult function report on September 22, 2008. (R. at 183-92.) She indicated that her daily activities included mopping, washing dishes, eating lunch, taking naps, dusting when she was able, reading books, watching television, doing some laundry and eating dinner. (R. at 183, 185.) She wrote that she did not take care of a pet or anyone else and that she could no longer work, go shopping, drive or function because of her illness. (R. at 184.) Plaintiff's pain kept her up at night and eventually led her to cut off all her hair, because she could not hold up her arms. (R. at 184.) She indicated that she could make a sandwich and occasionally put food in the crockpot but might make a "full meal" once or twice a month, because she would take all day to cook a meal. (R. at 185.) Plaintiff noted that bending over or pulling added to her pain. (R. at 186.)

Plaintiff indicated that she did not go out much, because her chronic fatigue and fibromyalgia left her exhausted. (R. at 186.) She could drive or ride in a car, but she never knew when she would have flare-ups or when her skin would begin to feel like needles were poking her. (R. at 186, 191.) Plaintiff indicated that she could shop for only forty-five minutes at a time, because she would swell or be in pain and could not function. (R. at 186, 191.)

Plaintiff enjoyed reading and occasionally using the computer. She would only visit her doctors' offices or her son's house. (R. at 187.) Plaintiff indicated that her illness affected her memory and concentration as well as her ability to lift, walk, climb stairs, squat, sit, bend, kneel, stand, reach, use her hands, get along with others and complete tasks. (R. at 188.) Plaintiff indicated that she could lift ten pounds and walk thirty to forty feet with assistance before needing to stop and rest for five to seven minutes. (R. at 188.) She noted that she became slower at following directions due to her pain, but that she did follow them to the best of her

12

ability and occasionally would become confused.  (R. at 188.)  She also did not handle stress

well, because she would get confused and her pain level would rise.  (R. at 189.)  Plaintiff used a

cane daily and a doctor-prescribed knee brace five to ten days a month.  (R. at 189.)

At the hearing before the ALJ, Plaintiff testified that she had been an office manager and

groundskeeper for King George Mini Storage, where she would walk around the property, show

customers around and clean out storage units.  (R. at 24-26.)  At the credit union, Plaintiff was a

delinquency control officer and handled accounts, sent out late notices, repossessed vehicles,

foreclosed on mortgages and went to court for defaulted loans.  (R. at 26.)  She would also work

at a desk with a computer and retrieve files from the file room.  (R. at 26.)  Plaintiff personally

repossessed vehicles, cleaned them, posted the necessary paperwork for the vehicles and then

sold them herself.  (R. at 35.)

Plaintiff testified that she had chronic daily pain all over her body and took medication

for the pain.  Plaintiff rated her pain as consistently being an eight out of ten.  (R. at 26-27.)  She

further testified that she could lift or carry no more than twenty-five pounds, could either stand

or sit for a couple of hours at a time and could walk about fifty feet before requiring to stop.  (R.

at 27-28.)  Despite having occasionally fallen, Plaintiff had never gone to the emergency room

for a fall.  (R. at 29.)  Plaintiff testified that her fingers had been stiff for ten years and had gotten

worse since she last worked.  She also testified that she could dial a telephone with a pencil, but

not her fingers.  (R. at 29.)  Plaintiff stated that she slept for about four or five hours a night with

a two-hour nap every day.  (R. at 30.)  She had not gone to the grocery store in a year, did not

cook, did not maintain hobbies, did not routinely perform activities outside the home, rarely

socialized and needed assistance to enter the shower.  (R. at 30-31.)

13

Plaintiff also testified that her breathing became labored when she walked and she could only stand thirty minutes at a time. (R. at 33, 42.) Plaintiff described a special device that she needed to use for her silverware to aid in gripping and eating. (R. at 43.) Plaintiff testified that it took her half a day on a "good day" to dust mop the floors in her kitchen, living room and dining room and that she would have to stop about eight times and rest for about fifteen minutes at each break. (R. at 44-46.) Plaintiff further testified that she was completely bedridden for at least half of the thirty days leading up to the hearing and that she called her husband for help five to seven times over those fifteen days. (R. at 46-47.)   Throughout the hearing before ALJ Swank, Plaintiff rocked with pain. (R. at 47-48).

## II. PROCEDURAL HISTORY

Plaintiff protectively filed for DIB on January 10, 2008, claiming disability due to rheumatoid arthritis, fibromyalgia and fatigue with an alleged onset date of December 28, 2007. (R. at 94-96, 120.) The Social Security Administration ("SSA") denied Plaintiff's claims initially and on reconsideration.[10]  (R. at 50-51.) On April 17, 2009, Plaintiff testified before an ALJ. (R. at 11.) More than nine months later, on January 28, 2010, the ALJ issued a decision finding that Plaintiff was not under a disability. (R. at 17.)   More than one year later, on April 25, 2011, the Appeals Council denied Plaintiff's request to review the ALJ's decision, making the ALJ's the final decision of the Commissioner subject to judicial review by this Court. (*See* R. at 1-3.) On May 31, 2012, this Court *sua sponte* set the case for oral argument, which occurred on June 8, 2012.

---

[10] Initial and reconsideration reviews in Virginia are performed by an agency of the state government — the Disability Determination Services ("DDS"), a division of the Virginia Department of Rehabilitative Services — under arrangement with the SSA. 20 C.F.R. pt. 404, subpt. Q; *see also* § 404.1503. Hearings before administrative law judges and subsequent proceedings are conducted by personnel of the federal SSA.

## III. QUESTIONS PRESENTED

Was the Commissioner's determination that Plaintiff retained the physical ability to perform her past relevant work supported by substantial evidence in the record and the application of the correct legal standard?

In the absence of substantial evidence to support the Commissioner's determination, did Plaintiff present substantial evidence to support a finding of disability?

## IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. Jan. 5, 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, less than a preponderance, and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion. *Id.* (citations omitted); *Craig*, 76 F.3d at 589 (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

To determine whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (citation omitted) (internal quotation marks omitted); *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589). In considering the decision of the Commissioner based on the record as a whole, the Court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951) (internal quotation marks

omitted)). The Commissioner's findings as to any fact, if the findings are supported by substantial evidence, are conclusive and must be affirmed. *Hancock*, 667 F.3d at 476 (citation omitted). While the standard is high, if the ALJ's determination is not supported by substantial evidence on the record, or if the ALJ has made an error of law, the district court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro*, 270 F.3d at 177. The analysis is conducted for the Commissioner by the ALJ, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied and whether the resulting decision of the Commissioner is supported by substantial evidence on the record. *See Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA").[11] 20 C.F.R. §§ 416.920(b), 404.1520(b). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.* If the claimant establishes that she did not engage in SGA, the second step of the analysis requires her to prove that she has "a severe impairment . . . or combination of impairments which significantly limit[s] [her] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe

---

[11] SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the claimant can return to her past relevant work[12] based on an assessment of the claimant's residual functional capacity ("RFC")[13] and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that she must prove that her limitations preclude her from performing her past relevant work. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472 (citation omitted).

However, if the claimant cannot perform her past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in

---

[12] Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

[13] RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Bowen*, 482 U.S. at 146 n.5). The Commissioner can carry his burden in the final step with the testimony of a vocational expert ("VE"). When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents *all* of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

### V. ANALYSIS

Plaintiff's primary argument is that substantial evidence did not exist to support the ALJ's RFC determination at Step Four, in which the ALJ determined that Plaintiff had the ability to perform light work and could perform her past relevant work. (Pl.'s Mem. at 8.) Defendant disagrees and asserts that "the ALJ accurately depicted the evidence in finding that Plaintiff was less than fully credible." (Def.'s Mot. for Summ. J. and Brief in Supp. ("Def.'s Mem.") at 9.)

A.      **Plaintiff does not challenge the ALJ's determinations in Steps One through Three.**

While Plaintiff does not challenge the ALJ's determinations in Steps One through Three, the Court will nonetheless briefly summarize that portion of the ALJ's decision. The ALJ found at Step One that Plaintiff had not engaged in substantial gainful activity since December 28, 2007. (R. at 13.) At Step Two, the ALJ determined that Plaintiff was severely impaired from fibromyalgia, coronary artery disease and osteoarthritis. (R. at 13-15.) The ALJ then

18

summarized medical records from Dr. Maestrello, Plaintiff's treating physician for her fibromyalgia. (R. at 14.)

At Step Three, the ALJ concluded that Plaintiff's maladies did not meet one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1. (R. at 15.) In doing so, the ALJ noted that Plaintiff's fibromyalgia and osteoarthritis did not rise to the level of section 1.02, because there was no major dysfunction of a joint, Plaintiff did not require an assistive device for ambulation and she did not have an inability to perform fine and gross movements. (R. at 15.)

**B.      The ALJ engaged in repeated errors throughout his Step Four analysis.**

At Step Four, the ALJ assessed that Plaintiff was able to perform her past relevant work as a sales associate, office manager and delinquency prevention officer. (R. at 17.) In doing so, he determined that Plaintiff had the RFC to perform light work, but was limited to occasional climbing, balancing, stooping, kneeling, crouching and crawling. (R. at 15.) To determine Plaintiff's credibility, the ALJ turned to Plaintiff's assertions about the level of her pain and her other symptoms:

> In terms of the claimant's alleged pain and other symptoms, physical examinations have been generally within normal limits.  The claimant has required only conservative treatment with no surgeries or hospitalizations during the period at issue.  The claimant was not referred to a specialist for treatment of fibromyalgia but continued to see her primary care physician at Virginia Physicians.  The claimant alleged hand problems since the early 1990s but examinations have indicated only mild tenderness with no diagnostic evidence of severe hand problems.  The claimant alleged she uses a cane but no assistive device has been prescribed by a doctor.  The claimant did not make specific allegations that her heart condition renders her unable to work or limits her abilities to conduct activities of daily living.  The treating physicians made no mention of complaints by the claimant that her heart condition physically limits her, nor did they diagnose her as being hampered or unable to work due to coronary artery disease.

(R. at 16). A review of this paragraph — which is the essence of the ALJ's decision — reveals that Plaintiff is correct in her assertion that it is replete with error. The Court discusses these errors, line-by-line, below.

### 1.     The ALJ committed clear error by finding that Plaintiff had not been referred to a specialist.

First, the ALJ made a factual finding that Plaintiff had not been "referred to a specialist for treatment of fibromyalgia but continued to see her primary care physician at Virginia Physicians." (R. at 16.) This finding was clearly erroneous and contrary to the record. In Exhibit 4F, page 307, the record indicates that "[t]he patient is followed in Richmond by Dr. Ma[e]strello, a *rheumatologist*." (Emphasis added.) Therefore, the Commissioner's contention that "Plaintiff introduced no other evidence or testimony establishing Dr. Maestrello's specialty before the ALJ" is plainly wrong. (*See* Supp. Mem. Regard. Def.'s Mot. for Summ. J. ("Supp. Mem.") at 5 n.7.)

The fact that the ALJ committed clear error when he found that Plaintiff was never referred to a specialist for fibromyalgia is of consequence for two reasons: (1) it necessarily means that the ALJ's credibility determination cannot be accepted and (2) in cases where fibromyalgia is purportedly causing a plaintiff's disability, the treating physician rule is bolstered when a plaintiff is seeing a specialist. Under the applicable regulations and case law, a treating physician's opinion must be given controlling weight if: (1) it is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and (2) is not inconsistent with other substantial evidence in the record. *Craig*, 76 F.3d at 590; 20 C.F.R. § 416.927(d)(2); SSR 96-2p. The regulations do not require that the ALJ accept opinions from a treating physician in every situation, *e.g.*, when the physician opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), when the physician's opinion

is inconsistent with other evidence, or when it is not otherwise well supported. *Jarrells v. Barnhart*, No. 7:04-CV-00411, 2005 WL 1000255, at *4 (W.D. Va. Apr. 26, 2005); *see also* 20 C.F.R. §§ 404.1527(d)(3)-(4), (e) (evaluating opinion evidence).

As discussed below, fibromyalgia cannot be determined through diagnostic testing. Consequently, and "given the unique nature of fibromyalgia," courts have recognized the significance of a rheumatologist as a treating physician in a case like the one before the Court. *Rogers,* 486 F.3d at 245; *see also Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998) ("The Commissioner is encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). Because fibromyalgia consists of elusive and subjective symptoms, courts have found that the documentation of consistent treatment for a plaintiff's symptoms of pain and stiffness supported her treating physicians' opinions, and therefore awarded the treating physician controlling weight. *Rogers*, 486 F.3d at 243-44; *see also Green-Younger v. Barnhard*, 335 F.3d 99, 106-09 (2d Cir. 2003) (assigning controlling weight to plaintiff's treating physician because plaintiff "exhibited the clinical signs and symptoms to support a fibromyalgia diagnosis under the American College of Rheumatology (ACR) guidelines"); *Kelley*, 133 F.2d at 589 ("[Plaintiff's] treating physicians' diagnoses are amply supported by clinical data. Kelley's principal diagnosis at present is fibromyalgia and that diagnosis is clinically supported by the trigger point injections.").

Plaintiff was seeing a specialist for her fibromyalgia, who also happened to be her primary care physician. While Dr. Maestrello did not identify himself as a rheumatologist in his patient notes, another doctor's patient notes (which were included in the record and purportedly reviewed by the ALJ) plainly indicated that Dr. Maestrello was one. (R. at 307, 13.) Therefore,

21

the record clearly reflected that Plaintiff's primary care physician was a specialist who treats fibromyalgia. (*See* R. at 307.) And as such, the ALJ should have afforded Dr. Maestrello's opinions controlling weight.

Instead, the ALJ assigned significant weight to the non-treating state agency physicians and referred to Plaintiff's treating physician, Dr. Maestrello – a rheumatologist – as her "primary care physician," but not as a specialist. (R. at 16.)  Dr. Maestrello had been Plaintiff's treating physician since at least January 2007. (R. at 267.)  As a rheumatologist, Dr. Maestrello treated Plaintiff regularly for the complications arising from her fibromyalgia and possessed special training in this area. (*See* R. at 259-60, 256, 352.) The opinions that he included in his patient notes were not only supported by his own observations, but also by the observations of Plaintiff's family and friends, and therefore were supported by substantial evidence. (*See* R. at 214, 225-29.) As Plaintiff's treating physician, Dr. Maestrello opined that Plaintiff's fibromyalgia was "clearly present," "certainly could account for the pain and fatigue," was "considered to be moderate to high in severity," contributed to Plaintiff's inability "to work due to both a combination of pain and fatigue" and accounted for "most of her problems." (R. at 259-60, 256, 352.) Regardless, the ALJ effortlessly dismissed Dr. Maestrello's opinions and medical observations and, instead, afforded the non-treating state agency physicians significant weight. Doing so was clearly erroneous.

2.    **The ALJ was clearly erroneous when he characterized Plaintiff's physical examinations as being "within normal limits" and found that she "required only conservative treatment."**

The ALJ determined that, "[i]n terms of the [Plaintiff's] alleged pain and other symptoms, physical examinations have been generally within normal limits." (R. at 16.) Similarly, the ALJ found that Plaintiff "required only conservative treatment with no surgeries or

hospitalizations during the period at issue." (R. at 16.) Both sentences misstate the substantial medical evidence presented to the ALJ and the severity of Plaintiff's condition.

To assess the factual inaccuracies in the record with respect to Plaintiff's condition, the Court must first address the characteristics of Plaintiff's disease. Fibromyalgia is a rheumatic disease that can cause severe pain and fatigue, which is diagnosed based on tenderness in at least eleven out of eighteen "trigger points" on the body. *Stup v. Unum Life Ins. Co. of Am.,* 390 F.3d 301, 303 (4th Cir. 2004) (citing *Sarchet v. Chater,* 78 F.3d 305, 306 (7th Cir. 1996)). The Fourth Circuit and other courts have noted that fibromyalgia "'can interfere with a person's ability to carry on daily activities'" and that plaintiffs can have such "'a severe case of fibromyalgia as to be totally disabled from working, but most do not.'" *Id.* (quoting *Sarchet,* 78 F.3d at 307 (citations omitted)).

Courts have discussed the difficulties that they face with addressing fibromyalgia, because its symptoms are entirely subjective and there are no laboratory tests that can confirm the presence or severity of the syndrome. *Sarchet,* 78 F.3d at 306. The Seventh Circuit in *Sarchet* reversed and remanded plaintiff's disability claim for the Commissioner to "take another look" because the ALJ "may have [had] an unshakable commitment to the denial" of the claim, based on the plaintiff's fibromyalgia diagnosis. *Id.* at 309. Similarly, the Second Circuit has recognized difficulties in determining a plaintiff's disability due to fibromyalgia, as such a disease "eludes" objective measurement. *Green–Younger,* 335 F.3d at 108. Furthermore, the Sixth Circuit has noted that objective tests are of little relevance in determining the existence or severity of fibromyalgia, because fibromyalgia patients "manifest normal muscle strength and neurological reactions and have a full range of motion." *Preston v. Sec'y of Health & Human Servs.,* 854 F.2d 815, 820 (6th Cir. 1988).

The crux of disability cases, and especially those where fibromyalgia is the alleged disability suffered, is that Plaintiff's credibility is intertwined with the medical records. Fibromyalgia eludes diagnostic testing and thus the symptoms are entirely subjective. Its diagnosis, therefore, is based upon well-documented subjective symptoms by a rheumatologist. Thus, if an ALJ makes a credibility assessment based solely on objective medical evidence, he cannot properly determine a plaintiff's credibility with respect to fibromyalgia. And that is exactly what occurred here.

While Plaintiff's muscle strength was normal, Dr. Maestrello's patient notes overwhelmingly identify the existence of Plaintiff's fibromyalgia, tender points and severe pain. (*See, e.g.,* R. at 267, 265, 261, 259-60, 256-57, 352, 350, 382, 381.) Plaintiff was on a high dose of narcotics, supplemented Duragesic patches with Hydrocodone and reluctantly used Morphine cream on her knees. (R. at 382, 256.) Further, Dr. Maestrello's notes indicated that Plaintiff requested that he increase her narcotics dosage, but he was "very hesitant to do [it], particularly given the fact that when [Plaintiff] has come in she is on higher dose narcotics and still doing poorly." (R. at 382.)

While there are no surgeries available for fibromyalgia and the record does not reflect any hospitalizations, Plaintiff's medication regimen with respect to pain was far from "conservative." At one point, Dr. Maestrello became hesitant to increase Plaintiff's narcotics, because Plaintiff was not responding to prior increases. (R. at 382.) These notations showed that Plaintiff, who exhibited normal muscle strength and a full range of motion — a characteristic of fibromyalgia — was "miserable" and in pain beyond "normal" limits. It does not appear that the ALJ considered the severity of pain that Plaintiff continued to experience —

and Dr. Maestrello continued to document — despite the medication regimen employed. These errors contributed to the ALJ's incorrect credibility determination.

### 3. The ALJ erred when he omitted a finding about Plaintiff's hand stiffness, which was a key fact in determining Plaintiff's RFC.

Next, the ALJ concluded that, while Plaintiff had alleged "hand problems since the early 1990s," "examinations have indicated only mild tenderness with no diagnostic evidence of severe hand problems." (R. at 16.) The problem with this assertion is that Plaintiff's concerns with her hands were not only with tenderness, but also with stiffness. (*See* R. at 381, 29.) In fact, Plaintiff testified that the stiffness in her hands had worsened since she stopped working and that she needed assistive devices to use the phone or silverware. (R. at 29, 43.) While the ALJ's characterization of Plaintiff's mild tenderness in the hands is not clearly wrong, it materially omits Plaintiff's stiffness in her hands and mischaracterizes fibromyalgia as a disease that manifests itself easily in diagnostic testing. *See, e.g., Sarchet,* 78 F.3d at 306 (fibromyalgia's "symptoms are entirely subjective"). Doing so was clearly erroneous.

By omitting in his factual finding Plaintiff's well-documented issues with stiffness in her hands, the ALJ omitted a key issue relevant to Plaintiff's credibility. Plaintiff testified that she needed assistive devices to use the phone and eat. (R. at 29, 43.) Essentially, the stiffness in her hands — as documented and observed by her treating physician — is evidence of Plaintiff's RFC, or lack thereof. The stiffness found in Plaintiff's hands and her inability to use a phone shows that Plaintiff has no RFC and should be disabled. Because the ALJ ignored this key piece of information, his RFC determination cannot be upheld.

### 4. The ALJ mischaracterized Plaintiff's inability to ambulate.

While the ALJ found that "no assistive device has been prescribed by a doctor" (R. at 16), the evidence overwhelmingly corroborates that a cane is essential to Plaintiff's ambulation.

25

Drs. Hassan and Vinh, the non-treating state agency physicians, both indicated that Plaintiff did not require a cane. (R. at 316, 370.) However, these opinions occurred before the statements of Plaintiff's friends and doctor were submitted to the ALJ. In actuality, friends of Plaintiff indicated that she required the use of a device to assist her in walking. (R. at 214, 227.) Independently of Plaintiff's friends, Dr. Maestrello observed that Plaintiff had difficulty walking and used a cane. (R. at 382.) Finally, and most tellingly, a worker at the Commissioner's office noted that Plaintiff had difficulty walking and used a cane. (R. at 117.) Thus, the evidence in the record overwhelmingly supports a conclusion that Plaintiff (1) had trouble walking and (2) required the use of a cane to walk.

Plaintiff's fatigue, difficulty walking and necessary use of a cane support her credibility in determining whether she is disabled under the Act and cannot work. While the ALJ's finding that Plaintiff did not have a prescription for her cane was not factually incorrect, it ignored her actual need for the cane to walk. The ALJ's focus on Plaintiff's lack of a prescription for a cane, and not on whether Plaintiff could ambulate effectively without one, was clearly erroneous.

### 5.     The ALJ clearly erred when he determined that Plaintiff was capable of many activities of daily living.

Finally, the ALJ made a cursory note that Plaintiff's "testimony indicate[d] that she is capable of many activities of daily living." (R. at 16.) Substantial evidence does not support this statement; rather Plaintiff's testimony "demonstrates that the ALJ mischaracterized the scope of her ability to perform daily activities." *Kline v. Astrue*, No. 1:08cv2284, 2009 WL 4730590, at *3 (N.D. Ohio Dec. 2, 2009). While Plaintiff did mark activities that she could perform, (*see* R. at 183, 185), she testified at the hearing that she did not cook, maintained no hobbies and rarely left the house (R. at 30-31). Additionally, Plaintiff testified that she had been bedridden for half of the month leading up to her hearing. (R. at 46-47.) Statements from Plaintiff's friends and

family also indicate Plaintiff's severe pain and fatigue (R. at 214, 226, 227, 228, 229) and Dr. Maestrello observed that Plaintiff looked "miserable" (R. at 382).

The ALJ's erroneous factual finding goes directly to whether Plaintiff had any RFC — and especially whether she could perform the RFC that the ALJ determined she could perform: light work with some limitations. The record overwhelmingly indicates that Plaintiff is, essentially, in severe pain, fatigued, bedridden and can rarely perform activities of daily living. There was no evidence offered to contradict these statements, save the second-hand opinions of the non-treating state agency physicians. Consequently, the ALJ's findings are unsupported and plainly wrong.

6. **The ALJ erred when he assigned the non-treating state agency physicians "significant weight" instead of assigning controlling weight to Dr. Maestrello, Plaintiff's treating rheumatologist.**

In his decision, the ALJ assigned significant weight to the "nonexamining sources" who "indicated that [Plaintiff] has the necessary residual functional capacity to perform work." (R. at 16.) Drs. Hassan and Vinh were both paid by the state to opine on Plaintiff's RFC. Their specialty was not noted within their opinions. They never treated, or even saw, Plaintiff. Neither Dr. Hassan nor Dr. Vinh considered the submissions of Plaintiff's family and friends. Rather, they relied mostly on patient notes from Dr. Maestrello, Plaintiff's specialist.

Even in Dr. Hassan's reliance on Dr. Maestrello's notes, Dr. Hassan clearly erred when he indicated that Plaintiff had never been treated for pain or tenderness in multiple areas. (*See* R. at 316.) Notations of tenderness in multiple areas are littered throughout Dr. Maestrello's medical notes. (*See, e.g.,* R. at 267, 265, 261, 259-60, 256-57, 352, 350, 382, 381.) Dr. Hassan also indicated that Plaintiff had a full range of motion and normal strength. (R. at 316.) While such a statement is technically correct, it dismisses the elusive nature of fibromyalgia. Perhaps

27

because he is not a rheumatologist, Dr. Hassan incorrectly focused on the objective medical record. These errors were mimicked by the ALJ in his decision and resulted in clearly erroneous factual findings, as discussed above.

A few months later Dr. Vinh, another state agency non-treating physician, correctly noted that Plaintiff had been treated for pain and tenderness in multiple areas. (R. at 369.) He also, however, indicated that Plaintiff had a full range of motion and normal strength, along with persistent pain and tenderness. (R. at 369.) Like Dr. Hassan, Dr. Vinh was "concerned solely with objective medical evidence;" however, "in light of the unique evidentiary difficulties associated with the diagnosis and treatment of fibromyalgia, opinions that focus solely upon objective evidence are not particularly relevant." *Rogers*, 486 F.3d at 245. While both non-treating physicians opined that Plaintiff could work an eight-hour workday, the evidence in the record overwhelmingly suggests that Plaintiff was incapable of doing so.

As discussed above and based on his specialty and long history of treating Plaintiff, Dr. Maestrello's opinions should have been assigned controlling weight. At oral argument, counsel for the Commissioner conceded that, in contrast to Dr. Maestrello, Dr. Hassan is not a rheumatologist. (O.A. at 4:49 P.M.) Counsel for the Commissioner also conceded that the opinion of a specialist should be given greater weight than a non-specialist, and that the opinion of a treating physician should be given greater weight than a non-examining doctor, unless the evidence undermines the treating physician. (O.A. at 4:50 P.M.) Of course, this concession is in accord with the "treating physician" rule. *See Kelley*, 133 F.3d at 589 (encouraging the Commissioner to assign more weight to opinions of treating physicians who are specialists); *Mitchell v. Schweiker*, 699 F.2d 185, 187-89 (4th Cir. 1983) (reversing an ALJ's decision, because a treating physician's opinion "is entitled to great weight for it reflects an expert

28

judgment based on a continuing observation of the patient's condition over a prolonged period of time"). Because Dr. Maestrello's opinions should have been assigned controlling weight, and because the non-treating state agency physicians' opinions "are not particularly relevant," the ALJ erred when he assigned Drs. Hassan and Vinh's opinions controlling weight.

C.      **Substantial evidence does not exist to support the ALJ's decision.**

This Court must give great deference to the ALJ's credibility determinations, unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997) (quoting *NLRB v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)). Here, however, the record readily demonstrates that the ALJ committed clear error in the sole paragraph in which the ALJ addressed the credibility of Plaintiff's symptoms. The factual findings contained in the paragraph discussed above were the lynchpin of the ALJ's entire decision. One by one, those factual findings have been shown to be clearly erroneous. *See United States v. United States Gypsum Go.*, 333 U.S. 364, 395 (1949) ("A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."). In the case before this Court, the ALJ's factual findings and credibility determinations were clearly erroneous, and thus unreasonable, because they contradicted the substantial evidence presented in the record. This Court therefore cannot accept the ALJ's factual findings or credibility determination.

The Commissioner argues that "there is unquestionably substantial evidence" in the record to support the ALJ's determination that Plaintiff has an RFC to perform light work. (Supp. Mem. at 6.) The Court disagrees. While Plaintiff testified that she was able to lift, stand,

29

sit and walk, the evidence overwhelmingly shows that Plaintiff was absent from work on many

occasions and required several accommodations to perform her last relevant work. If a plaintiff

suffers from such severe pain and fatigue that it requires her to be bedridden for half a month,

she cannot possibly perform light work, let alone any work. In an instance such as here, where

the ALJ clearly errs in factual findings used to support his credibility determination, substantial

evidence cannot exist to support his final determination.

## VI. REMEDY

Having concluded above that substantial evidence does not exist to support the ALJ's

decision, sentence four in 42 U.S.C. sec. 405(g) gives the Court the authority to remand or award

benefits. *See Sullivan v. Finkelstein*, 496 U.S. 617, 629 (1990) ("The fourth sentence does not

require the district court to choose between entering a final judgment and remanding; to the

contrary, it specifically provides that a district court may enter judgment 'with or without

remanding the cause for a rehearing.'" (quoting 42 U.S.C. § 405(g))). And contrary to the

assertions of counsel for the Commissioner at oral argument, directly awarding benefits without

remanding the case for a further hearing is not unusual — many courts have awarded benefits

without remand. *See, e.g., Hines v. Barnhart*, 453 F.3d 559, 565 (4th Cir. 2006) ("Because the

record establishes [plaintiff's] entitlement to benefits, we will award benefits without remand.");

*Crider v. Harris*, 624 F.2d 15, 17 (4th Cir. 1980) ("On the state of the record, [plaintiff's]

entitlement to benefits is wholly established. Rather than remand, therefore, we reverse, with

directions that benefits be awarded."); *Culbertson v. Sec'y of Health & Human Servs.*, 859 F.2d

319, 324-25 (4th Cir. 1988) ("Certainly, we perceive no reason why this already extraordinarily

protracted matter should be extended further."); *Vitek v. Finch*, 438 F.2d 1157, 1160 (4th Cir.

1971) ("We hold that there is no substantial evidence, on the record as a whole, to support the Secretary's denial of benefits.").

While the Commissioner noted that finding a person has fibromyalgia does not make that person *per se* disabled (*see* Supp. Mem. at 5 n.6), courts have directly awarded benefits in cases where the plaintiff has established disability due to fibromyalgia. *See Green-Younger*, 355 F.3d at 109 (reversing and awarding benefits for disability due to fibromyalgia); *Barker-Bair v. Commissioner*, No. 1:06-cv-696, 2008 WL 926569, at *2 (S.D. Ohio Apr. 3, 2008) (finding that an award of benefits in a fibromyalgia case is proper "because the 'proof of disability is strong and evidence to the contrary is lacking'" (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994)); *Maynard v. Astrue*, No. 3:06cv988, 2008 WL 925282, at *10 (M.D. Tenn. Apr. 3, 2008) (awarding benefits of disability for a claimant who suffered from fibromyalgia). Awarding benefits in a case such as Plaintiff's is neither unheard of nor necessarily rare.

Of course, directly awarding benefits is only appropriate only when: (1) the ALJ had the opportunity to fully develop the record; (2) based on the entire record, substantial evidence indicates that plaintiff is disabled; and (3) a remand would not serve any purpose, but would only delay the receipt of benefits as a useless formality. *O'Connor v. Astrue*, No. 3:09-1887-JFA-JRM, 2010 WL 3699329, at *10 (D.S.C. Aug. 25, 2010).

A.    **The ALJ had the opportunity to fully develop the record.**

The Commissioner argues that "the only appropriate remedy is to remand the case for further administrative proceedings to allow the ALJ to determine" Step Five. (Supp. Mem. at 8.) Because substantial evidence existed to find Plaintiff completely disabled, remand is not necessary to reach Step Five. Regardless, the ALJ had the opportunity to fully develop the record and hear testimony from a VE, but he refused to do so. The ALJ's refusal to hear VE

31

testimony should not be used to punish Plaintiff, especially in a case such as here, where Plaintiff has established that substantial evidence existed to determine that she is disabled under the Act. *See Taylor v. Weinberger*, 512 F.2d 664, 668-69 (4th Cir. 1975) (recognizing that remanding for testimony of a VE would be fruitless, as the record clearly evidenced a finding of disability).

As the Commissioner adroitly points out, "when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits," the Court should reverse an AJL's decision and award benefits. *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984). The record in this case has been fully developed.

**B.      Based on the entire record, substantial evidence indicates that Plaintiff is disabled.**

Plaintiff submitted medical records and opinions from a specialist who treats fibromyalgia. Her testimony was consistent with her medical records and the statements she provided from friends and family. Thus, the medical records from Dr. Maestrello, Plaintiff's testimony and the statements from Plaintiff's friends and family all corroborate each other. When viewed as a whole, Dr. Maestrello's notes, Plaintiff's testimony and the statements of Plaintiff's friends and family all conclusively demonstrated that Plaintiff has no residual functional capacity to work and is disabled under the Act. *See Gordils v. Sec'y of Health & Human Servs.*, 921 F.2d 327, 329 (1st Cir. 1990) (The ALJ is not "precluded from rendering common-sense judgments about functional capacity based on medical findings, as long as the [ALJ] does not overstep the bounds of a lay person's competence and render a medical judgment."); *see also Felton-Miller v. Astrue*, No. 2:10-cv-5-FL, 2010 WL 4809030, at *13 (E.D.N.C. Oct. 4, 2010) (same).

32

A key piece of evidence supporting Plaintiff's disability claim is provided by Plaintiff's past employer, Mr. Kang. The ALJ assigned little weight to Mr. Kang's statement and the other statements of Plaintiff's friends and family, because Mr. Kang's opinion was "inconsistent with the medical evidence and other evidence of the record." (R. at 16.) However, there is no evidence in the record to determine that these statements are inconsistent with Plaintiff's medical records. In fact, the ALJ incorrectly concluded that Plaintiff's statements from family and friends were not supported by substantial evidence. Instead, "the record, when read as a whole, reveals no inconsistency between" those statements and Dr. Maestrello's records. *Hines*, 453 F.3d at 565.

Plaintiff worked for Mr. Kang for almost a decade. (R. at 228.) When Plaintiff resigned in December 2007, Mr. Kang accepted her resignation begrudgingly, despite Plaintiff's frequent absences and requirement of a couch on which she could sleep during working hours. (*See* R. at 228.) Mr. Kang's observations of Plaintiff's severe fatigue are corroborated by Plaintiff's treating physician's notes. His accommodations went above and beyond what would normally be required of him, and demonstrate that Plaintiff is clearly disabled under the Act. This fact becomes especially true when the record is read as a whole.

The Commissioner recognized in his Supplemental Brief "that if Plaintiff's complaints about the debilitating effect of her condition were fully believed and credited, they could support a finding of disability." (Supp. Br. at 6.) The Court agrees. Plaintiff's fibromyalgia is one of those rare instances where her case is so severe that she is totally disabled from working. *See Stup*, 390 F.3d at 303 (noting that plaintiffs can have "'a severe case of fibromyalgia as to be totally disabled from working'").

C.   **A remand would not serve any purpose, but would only delay the receipt of benefits as a useless formality.**

"Social security disability and SSI benefits exist to give financial assistance to disabled persons because they are without the ability to sustain themselves." *Gordon v. Schweiker*, 725 F.2d 231, 237 (4th Cir. 1984). That is the case here. Plaintiff has a long work history and was an exemplary employee. Plaintiff's employer made many accommodations above and beyond what was required of him, but unfortunately Plaintiff ultimately could not continue to work for him — the severe pain and fatigue from her fibromyalgia became too overwhelming. Having resigned her job due to her illness, Plaintiff informed Dr. Maestrello that she could not afford physical therapy. Plaintiff meets the three-part test set forth in *O'Connor* and should no longer be deprived of disability payments.

Because the well-developed record — viewed as a whole — substantially established Plaintiff's entitlement to benefits, the Court recommends this case be remanded with full benefits awarded.

## VI. CONCLUSION

Based on the foregoing analysis, it is the recommendation of this Court that Plaintiff's motion for summary judgment and motion to remand (ECF No. 7) be GRANTED; that Defendant's motion for summary judgment (ECF No. 9) be DENIED; and, that the final decision of the Commissioner be REVERSED and FULL BENEFITS BE AWARDED, effective as of December 28, 2007.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable Henry E. Hudson and to all counsel of record.

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a *de novo* review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.

/s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Dated: June 22, 2012

35