IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

DEBRA LOVING, )
)
Plaintiff, )
)
v. ) Civil Action No. 3:11cv411-HEH
)
MICHAEL J. ASTRUE, )
Commissioner of Social Security, )
)
Defendant. )

## MEMORANDUM OPINION
(Adopting Report and Recommendation in Part)

This is an action challenging the Social Security Administration ("SSA")'s denial of disability ("DIB") benefits to Plaintiff Debra Loving ("Loving"). The matter is presently before the Court on the Report and Recommendation ("R&R") of the U.S. Magistrate Judge concerning the parties' cross-motions for summary judgment and Loving's motion to remand, as well as the Defendant Commissioner of Social Security's (the "Commissioner") objections thereto. This Court will dispense with oral argument because it would not materially aid in the decisional process.

For the reasons set forth herein, the Commissioner's objections will be overruled in part and sustained in part, and the R&R will be adopted in part. Accordingly, Loving's motion for summary judgment will be granted; the Commissioner's motion for summary judgment will be denied; the decision of the Commissioner will be reversed; and the matter will be remanded for further consideration by the SSA.

1

# I. BACKGROUND[1]

Loving previously worked in a variety of careers, most recently as an office manager and groundskeeper for a self-storage company. (R. at 227-28.) Because she suffers from rheumatoid arthritis,[2] fibromyalgia,[3] and fatigue, her last employer provided her with a number of accommodations to allow for her continued employment. (*Id.*) But by December 31, 2007, Loving's condition had deteriorated to the point that her employer believed that she could "no longer work." (*Id.*)

Soon after, in January of 2008, Loving applied for DIB benefits under the Social Security Act ("the Act") alleging onset as of December 28, 2007. (R. at 94, 120.) The SSA denied the claim in the first instance on February 22, 2008 and upon reconsideration on October 23, 2008.[4] (R. at 56, 66.)

Upon her request, a hearing was held before an administrative law judge ("ALJ") on April 17, 2009, at which time Loving testified on her own behalf. (R. at 11, 21-49.) Roughly nine months later, on January 28, 2010, the ALJ issued a decision finding that Loving was not under a disability. (R. at 17.) More precisely, he concluded that Loving

---

[1] The following facts are drawn from the administrative record, which has been filed under seal pursuant to E.D. Va. L. R. 5 and 7(C). In accordance with these Rules, this Court will endeavor to exclude any personal identifiers from its discussion, and will incorporate Loving's medical information only to the extent necessary for proper analysis. The Court will reference the record using the following citation format: (R. at [page number].).

[2] Rheumatoid arthritis "is a chronic systemic disease primarily of the joints . . . marked by inflammatory changes in the synovial membranes and articular structures and by muscle atrophy and rarefcation of the bones." *Dorland's Illustrated Medical Dictionary* 157 (32d Ed. 2012).

[3] Fibromyalgia results in "pain and stiffness in the muscles and joints that either is diffuse or has multiple trigger points." *Id.* at 703.

[4] Under arrangement with the SSA and pursuant to 20 C.F.R. pt. 404, subpt. Q, initial and reconsideration reviews in Virginia are performed by the Disability Determination Services, a division of the Virginia Department of Rehabilitative Services. But hearings before ALJs and all proceedings thereafter are conducted by employees of the federal SSA.

suffered from several "severe impairments," including fibromyalgia, coronary artery disease, and osteoarthritis, but nonetheless maintained the residual functional capacity ("RFC")[5] to perform her past relevant job duties, with some limitations, as a delinquency control officer, office manager, and sales associate. (R. at 13, 15, 17.) In reaching his determination, the ALJ downplayed the opinions of the treating rheumatologist, Dr. Steven Maestrello, and gave significant weight to the opinions of the two non-treating state agency physicians, Drs. Syed Hassan and Luc Vinh. (R. at 16.) The ALJ also questioned the credibility of Loving's own statements and those of her family, friends, and employer, finding them to be "inconsistent with the medical evidence and other evidence of record." (R. at 16.)

Thirteen months later, on April 25, 2011, the Appeals Council denied Loving's request to review the ALJ's decision, making the ALJ's the final decision of the Commissioner, subject only to judicial review. (*See* R. at 1-3.)

On June 27, 2011, Loving filed a Complaint in this Court, challenging the Commissioner's decision under 42 U.S.C. § 405(g).[6] Both parties filed motions for

---

[5] RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities on a 'regular and continuing basis.' A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The ALJ must describe the maximum amount of work-related activity the claimant can perform—in an ordinary work setting on a regular and continuing basis—based on the evidence available on the case record. *Id.*

[6] 42 U.S.C. § 405(g) provides:

> Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow. Such action shall be

summary judgment, which were referred to the Magistrate Judge for an R&R. Upon review, the Magistrate Judge concluded that the ALJ's finding was not supported by substantial evidence in the record and that the ALJ had made several significant errors. (ECF No. 17 [hereinafter "R &R"]. at 29-30.) Accordingly, the R&R recommended that Loving's case be reversed and benefits awarded effective December 28, 2007.

The Commissioner has objected to the R&R on several grounds. (ECF. No. 18 [hereinafter Def.s' Objs.].) First, he contends that any alleged errors on the part of the ALJ are harmless because a "review of these alleged errors, the ALJ's opinion, and the Administrative Record, demonstrates that in each instance, substantial evidence supports the ALJ's decision."[7] (Def.'s Objs. at 4.) Second, he argues that even should "the Court find the ALJ's decision was not supported by substantial evidence, the proper remedy is to remand the case to the agency for further administrative action, not reverse the case for payment of benefits." (Def.'s Objs. at 4.) The matter is now ripe for disposition.

## II. STANDARD OF REVIEW

This Court reviews *de novo* any part of the Magistrate Judge's R&R to which a party has properly objected. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b)(3). A reviewing

---

brought in the district court of the United States for the judicial district in which the plaintiff resides . . . .

At the time she filed suit, Loving was a resident of King George, Virginia. Venue is therefore proper in this Court. E.D. Va. Loc. R. 3(B)(4).

[7] The Magistrate Judge alleged six specific errors in the R&R. They include the failure to apply the appropriate legal standard in weighing the opinion of the treating physician and a series of misstatements and mischaracterizations of the record. This Court will treat the errors as a whole and determine whether substantial evidence exists in the record to support the ALJ's finding.

4

court may accept, reject, or modify, in whole or in part, the Magistrate Judge's recommended disposition. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b)(3)

"Determination of eligibility for social security benefits involves a five-step inquiry." *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002); *see also Johnson v. Barnhart*, 434 F.3d 650, 653 n.1 (4th Cir. 2005) (per curiam). At the first step, the claimant must demonstrate that she is not engaged in substantial gainful activity at the time of application. 20 C.F.R. § 404.1520(b). Second, the claimant must prove that she has "a severe impairment ... or combination of impairments which significantly limit[] [her] physical or mental ability to do basic work activities." *Id.* § 404.1520(c). At the third step, if the impairment matches or equals one of the impairments listed in the Act, and the impairment lasts—or is expected to last—for at least twelve months, then it constitutes a qualifying impairment and the analysis ends. *Id.* § 404.1520(d); *see* 20 C.F.R. pt. 404 subpart P app. 1 (listing impairments). If, however, the impairment does not meet one of those listed, then the ALJ must compare the claimant's RFC with the "physical and mental demands of [the claimant's] past relevant work."[8] *Id.* § 404.1520(f). If such work can be performed, then benefits will be denied. Finally, if the claimant cannot perform past work, then the burden shifts to the Commissioner to show that the claimant is capable of performing other work that is available in significant numbers in the national economy. *Id.* § 404.1520(g)(1).

---

[8] Past relevant work is defined as any substantial gainful activity ("SGA") in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a). SGA is work that is both substantial and gainful as defined by the SSA in the C.F.R. Work is substantial if it "involves doing significant physical or mental activities" and it "may be substantial even if it is done on a part-time basis or if [the claimant does] less, get[s] paid less, or [has] less responsibility than when [the claimant] worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is done for "pay or profit, whether or not a profit is realized."

5

When reviewing a denial of benefits by the Commissioner pursuant to 42 U.S.C. § 405(g), this Court must accept the Commissioner's findings of fact if they are supported by substantial evidence and were reached by applying the correct legal standard. *Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006); *see also Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (clarifying that the question is not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence). A finding is supported by substantial evidence if it is based on "relevant evidence [that] a reasonable mind might accept as adequate to support a conclusion." *Johnson*, 434 at 653. In other words, substantial evidence requires more than a scintilla, but less than a preponderance of the evidence. *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001).

In determining whether substantial evidence exists, the Court must consider the record as a whole. *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991). The Court may not, however, weigh conflicting evidence, evaluate the credibility of evidence, or substitute its own judgment. *Mastro*, 270 F.3d at 176. Thus, if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled," the Court must defer to the Commissioner's decision. *Johnson*, 434 F.3d at 653. At the same time, the Court "must not abdicate [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974) (citations omitted). If the Commissioner's decision is not supported by substantial evidence in the record, or if the ALJ has made an error of law, the Court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## III. ANALYSIS

### A. The ALJ Erred in Failing to Apply the Correct Legal Standard and to Fully and Fairly Develop the Record, and His Determination was Not Supported by Substantial Evidence

Pursuant to the standard of review, the Court must determine whether the record contains substantial evidence to support the ALJ's RFC determination and whether the ALJ applied the correct legal standard. As noted above, a showing of substantial evidence does not require a showing of preponderance, but the record as a whole must not contradict the findings of the ALJ. The weight attached to the various sources of evidence strongly shapes the conclusion reached regarding whether there is substantial evidence to support to the ALJ's disability determination. Furthermore, in certain instances, the law specifies the weight to be attached to particular evidentiary sources. Accordingly, as part of its review, the Court must ensure that the ALJ's weighing of the evidence conforms to the law.

In the case at hand, the Commissioner argues that the ALJ attached the appropriate weight to the observations of Dr. Maestrello, Dr. Hassan, Dr. Vinh, those lay persons who submitted letters on Loving's behalf, and Loving herself. Believing the ALJ's weighing and credibility analysis to be appropriate, the Commissioner argues that the ALJ properly considered Loving's complaints and that the record contained substantial evidence to support the ALJ's finding that Loving was not under a disability. Conversely, Loving argues that the ALJ's weighing of the evidence does not align with the law and that his finding is not supported by the record. Having carefully reviewed the record, the ALJ's analysis, and the recommendation of the Magistrate Judge, this Court finds that the ALJ's decision is not supported by substantial evidence in the record.

The ALJ's failure to properly identify the involvement of a treating physician specializing in rheumatology, Dr. Maestrello, is damning. This failure by the ALJ precluded him from giving the opinions of Dr. Maestrello the appropriate weight required by the law. Had the ALJ appreciated the significance of Dr. Maestrello's expertise and potential insights concerning Loving's condition and functionality, the ALJ might have taken the necessary steps to clarify and further develop the record. Particularly in light of the statements made by Loving and her friends, family, and employer concerning her deteriorating health and physical abilities, the ALJ had a duty to further develop the record. However, the ALJ inexcusably failed to apply the treating physician rule properly and then failed to develop the record sufficiently to make a reasonably informed determination as to Loving's RFC. In addition to these failures, and likely as a result of them, the record lacks substantial evidence to support the ALJ's finding.

### 1. *The ALJ Failed to Recognize Dr. Maestrello as a Specialist and to Accord his Testimony Proper Weight as Required by Law*

Recognizing the valuable insight gained by a physician with an ongoing, personal relationship with a patient, the Fourth Circuit has held that the opinion of a treating physician is generally entitled to deference. Typically, the ALJ must "accord greater weight" to the testimony of a treating physician than that of a physician who has not examined the claimant. *See Johnson*, 434 F.3d at 653; *see also* SSR 96-5p, 1996 WL 374183, at *4 (July 2, 1996) (stating that medical opinions from treating sources "are entitled to special significance" and "sometimes . . . are entitled to controlling weight"). Ultimately, the treating physician rule requires the opinions of such treating physicians be

given controlling weight, so long as they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence" in the record.[9] 20 C.F.R. § 404.1527(c)(2).

Conversely, the opinion of a treating physician warrants "significantly less weight" if it "is not supported by clinical evidence or if it is inconsistent with other substantial evidence." *Craig*, 76 F.3d at 590; *see also* 20 C.F.R. § 404.1527(c)(4) (explaining that the more consistent an opinion is with the record as a whole, the more weight it deserves). Even in such instances, however, the ALJ cannot disregard the physician's opinion, and, absent "persuasive contrary evidence," *Mastro*, 270 F.3d at 178, should still give it "more weight" than "a nontreating source" would normally receive. 20 C.F.R. § 404.1527(c)(2)(i); *see also id.* § 404.1527(c)(2)(ii) ("[T]he more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion."). Moreover, if the ALJ elects not to give the treating physician's opinion controlling weight, he must "give good reasons" for doing so. 20 C.F.R. § 404.1527(c)(2).

As the Magistrate Judge noted in the R&R, "in cases where fibromyalgia is purportedly causing a plaintiff's disability, the treating physician rule is bolstered when a plaintiff is seeing a specialist." (R&R at 20.) Generally, "the Commissioner is encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." *Kelly v. Callahan*,

---

[9] This is so because, as applicable regulations explain, these physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2).

9

133 F.3d 583, 589 (8th Cir. 1998). When evaluating the presence and impact of fibromyalgia, this deference to the treating specialist is critical due to the unique problems in diagnosing the disease and evaluating its impact on the patient. Numerous courts have recognized that fibromyalgia's "symptoms are entirely subjective and [that] there are no laboratory tests that can confirm the presence or severity of the syndrome." *Stahlman v. Astrue*, No. 3:10CV475, 2011 U.S. Dist. LEXIS 67715, at *21 (E.D. Va. May 17, 2011) (citing *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996)); *see also Rogers v. Comm'r Soc. Sec.*, 486 F.3d 234, 245 (6th Cir. 2007) ("[I]n light of the unique evidentiary difficulties associated with the diagnosis and treatment of fibromyalgia, opinions that focus solely upon objective evidence are not particularly relevant.") (citation omitted); *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003) (observing that fibromyalgia "eludes" objective testing and that "'objective' findings are not required in order to find that an applicant is disabled") (quoting *Donato v. Sec. of Dep't of Health and Human Servs.*, 721 F.2d 414, 418-19 (2d Cir. 1983)). Because of the subjective nature of diagnosing fibromyalgia, in person assessments take on a heightened significance, as they represent the best means for assessing the patient's condition. Thus, the law and reason require the opinions of the treating rheumatologist be accorded far more weight than those of non-treating and non-specialist physicians, so long as the opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(c)(2).

Here, the ALJ erroneously found that Loving "was not referred to specialist for treatment of fibromyalgia but continued to see her primary care physician at Virginia

Physicians." (R. at 16.) The record clearly indicates that Loving was "followed in Richmond by Dr. Ma[e]strello, a rheumatologist."[10] (R. at 307.) The significance of this error cannot be overstated. While the ALJ may have understood the applicability of the treating physician rule, his failure to realize that Dr. Maestrello was a specialist precluded him from applying the proper legal standard and according Dr. Maestrello's opinions the increased weight required by the law.

### 2. *The ALJ Failed to Meet his Duty to Properly Develop the Record*

In addition to applying the correct legal standards in his analysis, the ALJ has an obligation "to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and *cannot rely only on the evidence submitted by the claimant when that evidence is inadequate.*" Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986) (emphasis added). Since *Cook*, the Fourth Circuit has clarified that the ALJ "is not required to act as plaintiff's counsel," but must "fully and fairly develop the record" once the plaintiff has made a prima facie showing of entitlement to benefits. *Rice v. Chater*, No. 94-2001, 1995 U.S. App. LEXIS 9829, at *5 (4th Cir. May 1, 1995) (citations omitted); *see also Bell v. Chater*, No. 95-1089, 1995 U.S. App. LEXIS 14322, at *12-13 (4th Cir. June 9, 1995). To determine "whether an ALJ has fully and fairly developed the record, the proper inquiry is whether the record contains sufficient evidence." *Anderson v. Astrue*, No. 10-3084, 2011 U.S. Dist. LEXIS 141527, at *6 (W.D. Ark. Oct. 4, 2011) (citations omitted). Where substantial evidence in the record supports the ALJ's finding as to a particular issue, the

---

[10] Were it not for the exhaustive scrutiny of the record by the Magistrate Judge, this inexplicable oversight might have gone uncorrected by both the plaintiff and the defendant.

11

record is considered to be sufficiently developed. *See Mink v. Apfel*, No. 99-2480, 2000 U.S. App. LEXIS 11559, at *5 (4th Cir. May 22, 2000). However, the absence of substantial evidence to support the ALJ's finding not only exposes the ALJ's determination to potential reversal, but also may indicate that the ALJ has failed to develop the record sufficiently.

After reviewing the record as a whole, as required by *Wilkins*, the Court concludes that the record lacks substantial evidence to support the ALJ's finding concerning Loving's RFC. First, the record contains an abundance of evidence suggesting that Loving did at some point become incapable of performing work comparable to her past relevant work. Loving's own medical records, maintained and annotated by her rheumatologist, indicate that she suffered from fibromyalgia that was causing her increasing pain and discomfort. (R. at 267, 261, 257, 256, 352, 382, 381.) Loving's third visit to Dr. Maestrello on May 9, 2007 marks the first point at which the records suggest an increase in the severity of Loving's condition. During that visit, she explained that she had "been noticing more pain since" her last visit on March 8, 2007, and was "uncertain as to how much the pain medication [was] working." (R. at 261, 265.) Dr. Maestrello's notes from July 25, 2007 indicate that the pain "ha[d] been getting worse" since the May 2007 visit and that her fibromyalgia "certainly could account for the pain and fatigue." (R. at 259.) Dr. Maestrello then went on to opine that "the presenting problem [was] considered to be moderate to high in severity." (R. at 260.) Subsequently on October 24, 2007, Dr. Maestrello noted again that the diffuse pain "ha[d] been getting worse over the past couple of months." (R. at 257) Dr. Maestrello's notes from Loving's January 23, 2008 visit suggest that Loving "[was]

unable to work due to a combination of pain and fatigue."[11] (R. at 256.) Loving's health continued to deteriorate through 2008. On November 12, 2008, Dr. Maestrello noted that Loving appeared "miserable," complained of hurting "all over," and walked using a cane. (R. at 382.) These reports show a steady deterioration in Loving's condition and an unresponsiveness to pain medication. Furthermore, they suggest that by November 2008, the disease had significantly reduced Loving's physical abilities.

In addition to the medical records, Loving's own statements and those of her family, friends, and employer shed light on the severity of her fibromyalgia and its impact over time on her ability to perform her job and other daily tasks. (R. at 20-49, 183-92, 214, 225-29.) Loving completed an adult function report on September 22, 2008. (R. at 183-92.) While she indicated she could sometimes mop, wash dishes, and dust, she wrote that she did not take care of a pet or anyone else and that she could no longer work, go shopping, drive or function because of her illness. (R. at 183-85.) Loving reported that her pain would keep her up at night regularly and that bending over or pulling added to her pain. (R. at 184-86.) Loving added that she did not go out much, because her chronic fatigue and fibromyalgia left her exhausted. (R. at 186.) At the time of the report, she could drive or ride in a car, but she never knew when she would have flare-ups. (R. at 186, 191.) Furthermore, she could shop for only forty-five minutes at a time, because she would swell or be in pain and could not function. (R. at 186, 191.) Loving acknowledged that she could walk thirty to forty feet

---

[11] It is unclear from the medical records whether this is an opinion formed by Dr. Maestrello or a statement made by Loving that he recorded in his notes. This lack of clarity is illustrative of the imprecision in Dr. Maestrello's notes. While his notes certainly create the impression of a patient whose condition and functionality deteriorated rapidly, they do not give a clear assessment of the impact fibromyalgia has had on the patient's ability. This ambiguity is precisely why remand is the proper remedy, as explained *infra* at Section III (B).

with assistance before needing to stop and rest for five to seven minutes, but she used a cane every day and a doctor-prescribed knee brace five to ten days each month. (R. at 188-89.) She also claimed that she became slower at following directions due to her pain and occasionally would become confused. (R. at 188.)

On April 17, 2009, Loving testified at the hearing before the ALJ and elaborated on her deteriorating condition. Loving testified that she took prescribed medication for the chronic pain all over her body and that the pain consistently rated an eight on a scale of ten. (R. at 26-27.) She further testified that she could lift or carry no more than twenty-five pounds and could only stand comfortably for thirty minutes at a time. (R. at 27-28, 42.) Loving stated that her fingers had been stiff for ten years and had gotten worse since she last worked in December 2007. (R. at 29.) Furthermore, she could only dial a phone with the aid of pencil. (R. at 29.) Loving stated that she had not gone to the grocery store in a year, did not cook, did not maintain hobbies, did not routinely perform activities outside the home, rarely socialized, and needed assistance to enter the shower. (R. at 30-31.) Loving further testified that she was completely bedridden for at least half of the thirty days leading up to the hearing and that she called her husband for help five to seven times over those fifteen days. (R. at 46-47.)

Loving's family, friends, and employer also submitted letters between January and April of 2009 describing the debilitating impact fibromyalgia had had on Loving's life. (R. at 214, 225-29.) Loving's neighbors, Frank and Elizabeth Bowles, described her as constantly being in "agonizing pain with very limited mobility" and frequently incapacitated by her pain medication. (R. at 214.) Holly Hayden, her daughter-in-law, indicated that

14

Loving's health had been "spiraling downward for quite some time." (R. at 226.) Ms. Hayden wrote that Loving rarely attended family get-togethers and, if she did, she did not stay long due to pain and fatigue. (R. at 226.) Since she became ill, Loving's husband, Joey, had missed work on "countless occasions" to take care of his wife, who was "unable to care for herself due to the extreme pain and inability to move." (R. at 229.) Paul Kang, for whom Loving worked from May 19, 1998 through December 31, 2007, indicated that he undertook "extensive measures" to accommodate Loving at work, such as putting a couch in her office for her to rest. (R. at 228.) Mr. Kang added that as her health declined "she could not bend or stand for any period of time." (R. at 228.) A colleague of Loving's, Barbara Payne, wrote that at work Loving would get "weak, dizzy, [and] seem[ed] to be extreme in pain" and that Loving "struggled to maintain her job," frequently missing work because of the pain. (R. at 225.) Together with Loving's own statements and the observations recorded by Dr. Maestrello, these accounts from Loving's family, friends, and employer portray a woman whose deteriorating health precluded her from doing basic daily tasks. As well, the RFC determination made by the ALJ runs counter to these statements, but fails to show substantial evidence in the record contradicting them.

Second, the evidence relied on by the ALJ, the assessments by the non-treating state agency physicians, should have been accorded little weight. Neither Dr. Hassan nor Dr. Vinh personally examined or treated Loving, and neither doctor is a specialist in rheumatology. Rather, both relied exclusively on the medical records kept by Dr. Maestrello in forming their opinions. In doing so, they did not consider the relevant information provided by Loving and others who observed her physical decline on a daily

basis. Furthermore, as noted by the Magistrate Judge, Drs. Hassan and Vinh lacked proper expertise in rheumatoid disorders and relied solely on objective evidence despite its limited value in evaluating a fibromyalgia patient's condition. (R&R at 28.) While 20 C.F.R. § 404.1512(b)(6) requires the ALJ to consider the opinions of Drs. Hassan and Vinh in making his determination, their opinions, as non-specialists and non-treating physicians, have little relevance in fibromyalgia cases. *Rogers* specifically noted that due to the "unique evidentiary difficulties associated with the diagnosis and treatment of fibromyalgia, opinions that focus solely upon objective evidence are not particularly relevant." 486 F.3d at 245. In short, the opinions of Drs. Hassan and Vinh do not constitute substantial evidence in support of the ALJ's decision.

The Commissioner's alternative argument suggests his own appreciation for the lack of evidence to support the ALJ's finding. The Commissioner attacks Dr. Maestrello's opinions, contending that they "do not provide any treating physician 'opinions' establishing functional limitations for the plaintiff." (Def.'s Objs. to R&R at 5-6.) As discussed above, *supra* note 11, the Court appreciates that Dr. Maestrello's notes are imprecise. He clearly diagnosed Loving with fibromyalgia, but did not express a firm opinion as to its severity, saying only that it was "moderate to high in severity" in July 2007. (R. at 260.) Furthermore, in May 2008, Dr. Maestrello noted that he "suspect[ed]" fibromyalgia "accounts for most of her problems," but neither specified the problems to which he was referring nor the extent to which the illness impacted her ability to function. (R. at 352.) Lastly, Dr. Maestrello remarked in his notes that Loving "[was] unable to work due to both a combination of pain and fatigue." (R. at 256.) This statement raises two concerns. First,

it is unclear from the record whether the observation is Dr. Maestrello's conclusion or Loving's own statement as recorded by her doctor. The line can be read both ways. Second, as the Commissioner asserts, 20 C.F.R. § 404.1527(d)(1) reserves determinations of ability to work to the Commissioner, but this provision does not preclude consideration of Dr. Maestrello's opinion as evidence of the patient's functional limits. While the Commissioner is right to point out some of the limits of Dr. Maestrello's opinions, his argument misses the mark. The imprecise nature of Dr. Maestrello's records does not constitute substantial evidence in support of the ALJ's determination.

When viewed as a whole, the record cannot reasonably be construed to support the ALJ's RFC determination. Considering the dearth of evidence to support the ALJ's finding and the incomplete nature of the information provided by Dr. Maestrello, the treating rheumatologist, the ALJ failed to perform his duty to develop the record sufficiently. In making his determination, the ALJ neglected to give the treating physician's assessment the appropriate weight and failed to clarify any points of confusion in his assessment. If there was uncertainty as to the opinion of the treating physician, the ALJ had an obligation to seek clarification and to fully develop the record. Had the ALJ not been careless and overlooked the specialty of the treating physician, perhaps he would have been inclined to seek further input from Dr. Maestrello, but the ALJ failed to do so. Therefore, the Court affirms the Magistrate Judge's reversal of the ALJ's finding that Loving was not under a disability.

**B. Propriety of Remand with Instructions to Apply the Correct Legal Standard and to Fully Develop the Record**

Having found there to be no substantial evidence to support the ALJ's finding, the Court must now determine whether to remand or award benefits. The Fourth Circuit has instructed that where review of the record does not reveal substantial evidence supporting the denial of benefits, the district court "must reverse and remand for further proceedings." *Meyer v. Astrue*, 662 F.3d 700, 702 (4th Cir. 2011); *see also Cook*, 783 F.2d at 1174 (reversing and remanding where the ALJ's "insufficient development of the evidence" made it "impossible to conclude that there [was] substantial evidence to support" the finding of no disability). The Magistrate Judge recommended that full benefits be awarded. (R&R at 34.) The Commissioner asserts that even "if the Court finds that the ALJ's decision was not supported by substantial evidence, the proper remedy is to remand the case . . . ." (Def.'s Objs. to R&R at 18.) While the Court recognizes and appreciates the Magistrate Judge's thorough consideration of the matter, the Court will decline to award benefits and, instead, will remand the case with specific instructions for the ALJ for the following reasons.

First, the ALJ failed to apply the correct legal standard in evaluating Dr. Maestrello's opinion. Having concluded that the record lacks substantial evidence to support the ALJ's determination, the Court rejects the Commissioner's claim, which can be distilled to a harmless error claim. The ALJ had an obligation to apply the correct legal standard and failed to do so. As discussed previously, the ALJ's failure to note the specialty of the treating physician likely led him to attach insufficient weight to Dr. Maestrello's opinions and blinded him to the need to further develop the record.

Second, as noted above, the opinion of Dr. Maestrello is imprecise. Although the record is replete with evidence suggesting that Loving's fibromyalgia has rendered her

18

disabled, the Court is reluctant to make a conclusive finding given the potential confusion created by Dr. Maestrello's notes. Moreover, the Court believes that a more thorough development of the record will clarify how Loving's condition has evolved and how her fibromyalgia has reduced her physical ability over time.

On remand, the ALJ must fully and fairly develop the record. Specifically, the ALJ must attempt to clarify the opinions of the specialist, Dr. Maestrello. Furthermore, the ALJ must apply the correct legal standard and accord the opinions of the treating rheumatologist due deference. Lastly, the ALJ must consider the whole record, including the statements by Loving and her family, friends, and employer, in determining whether and when Loving qualified for disability.

## IV. CONCLUSION

Based on the foregoing analysis, this Court will overrule in part and sustain in part the Commissioner's objections and will adopt in part the Report and Recommendation of the Magistrate Judge. Accordingly, Loving's motion for summary judgment will be granted, and the Commissioner's motion for summary judgment will be denied. Because it is not supported by substantial evidence, the Commissioner's decision will be reversed and remanded for further development of the record and reconsideration of Loving's eligibility for disability.

An appropriate Order will accompany this Memorandum Opinion.

/s/
Henry E. Hudson
United States District Judge

Date: Sept 20, 2012
Richmond, Virginia